UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| KEMISHA MICHELLE-ANN MUIR, | ) |
| :--- | :--- |
| Plaintiff, | ) |
| v. | ) No. 2:19-cv-00013 |
| JORDAN DANNER, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

After the results of Kemisha Muir's blood test came back negative for both alcohol and drugs, she transformed from a criminal defendant suspected of driving under the influence to a civil plaintiff pursuing this § 1983 action. Before the Court is a Motion for Summary Judgment (Doc. No. 20) filed by the City of Livingston, Tennessee ("City of Livingston") and Police Officer Jordan Danner, Corporal Christopher Mace,[1] and Lieutenant Ray Smith (collectively, "Individual Defendants," and together with the City of Livingston, "Defendants"), which has been fully briefed by the parties (see Doc. Nos. 22, 31, 33, 35). For the following reasons, Defendants' motion will be denied in part and granted in part.

**I.     UNDISPUTED FACTS[2]**

On March 2, 2018, at around 10:18 p.m., off-duty Deputy Sheriff Robert Garrett called the Livingston Police Department Dispatch to report that he had seen a black SUV drive past him,

---

[1] Mace was promoted to Sergeant sometime after this case was filed.

[2] The facts in this section are undisputed unless specifically noted otherwise, and are drawn from the undisputed portions of the parties' statements of facts (Doc. No. 34), the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing, and portions of the Complaint (Doc. No. 1) that are not contradicted by the evidence in the record. For ease of reference, the Court will refer to the following deposition transcripts as: Doc. No. 32-4 ("Muir

"weav[e] pretty good between the lines," and "actually cross[] the line a time or two."[3] (Doc. No. 20-1 at 2–3.) Garrett also told dispatch that he believed the car was "doing the speed limit" and was not "going over the lines." Id. at 3. The dispatcher relayed this information to Livingston City Police Officer Jordan Danner to be on the lookout for a black SUV based upon a suspicion of driving while impaired. (Doc. No. 34 at ¶ 2; Doc. No. 20-3 at 2.)

Danner caught up to the vehicle (which he later learned was driven by Kemisha Muir) and observed Muir order food and proceed through a Taco Bell drive thru. After Muir exited the drive thru, Danner followed her car for approximately 250 yards and observed it weave within its own lane of traffic and "hit both the center line and the fog line several times." (Doc. No. 32-1 at 1; Doc. No. 20-3 at 2; Danner Dep. at 15:12–24:4.) Muir denies that she was speeding or swerving in her vehicle (Doc. No. 34 at ¶¶ 1, 3; Muir Dep. at 58:24–59:24). Regardless, Danner initiated a traffic stop based on suspicion of driving under the influence, and he eventually ordered Muir to exit her vehicle and walk to the front of his patrol car. (Doc. No. 20-3 at 2; Muir Dep. at 67:13–69:4.) At some point, Corporal Mace and Lieutenant Smith arrived on the scene, (Danner Dep. at 34:5–16), and Mace began recording the stop from his body camera.[4] (Doc. No. 20-4 at 2.)

The body camera video shows that while Muir and Danner stood in front of the patrol car, Danner administered a field sobriety test known as the horizontal gaze nystagmus ("HGN") test and instructed Muir to "follow my finger with your eyes and your eyes only, don't move your

---

Dep."); Doc. No. 32-5 ("Danner Dep."); Doc. No. 32-6 ("Mace Dep."); and Doc. No. 32-7 ("Smith Dep.").

[3] An audio recording of this call was manually filed with the Clerk's office as Defendants' Exhibit 1. (See Doc. Nos. 25, 27.)

[4] Danner testified that there is no dash cam recording of the stop itself. (See Danner Dep. at 21:8–22:3.)

2

head." (Danner Dep. at 60:2–7; Defendants' Manual Exhibit 2 ("Video") at 23:45:31.[5]) When the test began, Muir immediately moved her head to the left to follow his finger. (Video at 23:45:48.) Danner again told Muir not to move her head, and she then appeared to follow his finger's horizontal movement with just her eyes. (Id. at 23:45:49.) Although Muir started the test with a smile on her face, id. at 23:45:40, she became more upset and eventually stated: "I feel like you're wasting my time right now because I'm not intoxicated and I can do a breathalyzer and I can do a [urine] test for you." (Id. at 23:46:50.) However, Muir agreed to continue with the HGN test and she again appeared to follow Danner's finger with her eyes. (Id. at 23:48:07.) Danner then administered a non-standardized vertical gaze nystagmus ("VGN") test and asked Muir to follow his finger's vertical movement, which she appeared to do. (Id. at 23:48:31; Danner Dep. at 54:16–22.) When Danner told Muir that she had failed these tests, she quickly responded that she had astigmatism. (Video at 23:48:47.)

Next, Danner administered the "nine-step-walk-and-turn test." (Id. at 23:49:05; Danner Dep. at 54:4–15.) He asked Muir to place her right foot in front of her left foot, stand with her arms to her side, and hold that position until he finished giving her the test instructions. (Video at 23:49:12.) Danner then explained that he wanted Muir to take nine heel-to-toe steps, counting each step out loud, and then turn 180 degrees by planting her lead foot and taking small steps with her non-lead foot. (Id. at 23:49:25.) Last, Danner told Muir to walk another nine heel-to-toe steps back to where she started and the test would be complete. (Id. at 23:50:00.) Muir was able to take nine steps forward and nine steps back, counting each step out loud. (Id. at 23:50:12.) However, in addition to swaying and failing to keep her feet together during the instructions, Muir lost her

---

[5] Defendants' Exhibit 2 is a copy of the March 2, 2018 body camera video that was filed manually with the Clerk's office. (See Doc. Nos. 25, 27.) References to the video's timestamp reflect the approximate start time of an event.

3

balance during the test, almost fell several times, and raised her arms away from her body. (Id. at 23:50:12; see also Doc. No. 34 at ¶ 6.) At the end of the first nine steps, Muir also failed to turn correctly and instead hopped around and attempted to restart the test. (Video at 23:50:12; Doc. No. 34 at ¶ 6.)

At the conclusion of the walk-and-turn test, Danner administered the "one-leg-stand test." (Video at 23:51:06; Danner Dep. at 60:8–22.) Danner asked Muir to choose a leg to stand on, raise her other foot six or nine inches off the ground, keep her arms at her side, point her toe forward, look at her toe, and count "one thousand one, one thousand two, one thousand three," etc. until she reached thirty. (Video at 23:51:06.) After Muir confirmed she understood the instructions, she raised her foot, started counting at "thirty-one," raised her arms away from her body, and almost fell from being off balance. (Id. at 23:51:39; see also Doc. No. 34 at ¶ 7.) Muir then refused to complete the test, claiming that she could not balance and that she was nervous because three police officers were surrounding her. (Video at 23:52:04.)

Eventually Danner decided to administer the "fourth and final test," the finger-to-thumb counting test. (Id. at 23:52:53; Danner Dep. at 54:11–22.) This nonstandardized test measures a person's dexterity, and, in Danner's words, Muir "performed adequately." (Video at 23:52:53; Danner Dep. at 54:20–55:6.) Next, Danner asked Muir if she took any prescription medications, and she responded that she does not use drugs or drink alcohol. (Video at 23:53:33.) Danner then expressed his belief that Muir was intoxicated, advised her that she would be placed under arrest for driving under the influence, and stated that he was going to get a search warrant and draw her blood. (Id. at 23:53:36.) Muir again denied being intoxicated, stated that she does not use drugs or smoke, and exclaimed to Danner that: "You're going to be so, so disappointed when you find out that I don't do drugs and I don't drink." (Id. at 23:53:55.)

4

After Muir was arrested and seated in Danner's patrol car, Danner and Mace searched her vehicle for any drugs or medication she may have taken, but they did not find any. (See Doc. No. 20-4 at 2; see also Video at 23:55:00.) "Based upon [Danner's] Affidavit given under oath or affirmation" regarding probable cause, a Judicial Commissioner issued a search warrant to draw blood from Muir. (Doc. No. 32-3; see also Doc. No. 32-2.) The results of Muir's blood test revealed that she did not have any alcohol or drugs in her system (Doc. No. 20-7), and the criminal charges against her were eventually dismissed (Doc. No. 1 ¶ 39).

Based on the circumstances leading to her arrest and subsequent searches, Muir brought this § 1983 action against the Individual Defendants for allegedly violating her Fourth Amendment rights and against the City of Livingston based on municipal liability. (Doc. No. 1 at ¶¶ 44–45.) Defendants now move for summary judgment on all of Muir's claims.

## II.   LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). "But where, as here, there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light

5

depicted by the videotape.'" Green v. Throckmorton, 681 F.3d 853, 859–60 (6th Cir. 2012) (quoting Scott v. Harris, 550 U.S. 372, 378–81 (2007)). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

## III. ANALYSIS

### A. Muir's § 1983 Claims Against the Individual Defendants

Muir asserts claims against the Individual Defendants under 42 U.S.C. § 1983. Section 1983 provides that "an individual may bring a private cause of action against anyone who, acting under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statute." Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012) (citations omitted). Accordingly, to survive summary judgment in a § 1983 action, the plaintiff must demonstrate a genuine issue of material fact "that a person acting under color of state law deprived [her] of a right secured by the Constitution or laws of the United States." Green, 681 F.3d at 859–60 (citation omitted).

Here, Muir argues that the Individual Defendants—clearly "person[s] acting under color of state law"—violated her Fourth Amendment rights by (1) stopping her vehicle without reasonable suspicion or probable cause; (2) forcing her out of her vehicle and administering a field sobriety test without reasonable suspicion or probable cause to believe she was intoxicated; (3) illegally arresting her without probable cause; (4) searching her vehicle without probable cause or any valid exceptions to the warrant requirement; and (5) taking her blood without probable cause. (Doc. No. 31 at 1–2.)

6

Not only do the Individual Defendants dispute the merits of these claims, but they also argue that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013) (citation omitted). "In determining whether a defendant is entitled to qualified immunity, the court makes two inquiries: (1) '[t]aken in the light most favorable to the party asserting the injury [(i.e. Muir)], do the facts alleged show the officer's conduct violated a constitutional right[,]' and (2) was the right clearly established to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful." Kennedy v. City of Cincinnati, 595 F.3d 327, 336 (6th Cir. 2010) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).[6] Summary judgment must be denied if "the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury." Humphrey v. Mabry, 482 F.3d 840, 846 (6th Cir. 2007) (quoting Brandenburg v. Cureton, 882 F.2d 211, 216 (6th Cir. 1989)).

Applying these standards, the Court will now address each of the alleged constitutional violations in turn.

---

[6] The legal standard set forth in Saucier remains good law, but the requirement that these two questions be addressed in sequential order has since been relaxed. See Kennedy, 595 F.3d at 336–37; Pearson, 555 U.S. at 236 ("On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.")

1. Initial Traffic Stop

Muir first argues that the Individual Defendants violated her Fourth Amendment rights when they stopped her vehicle. (Doc. No. 1 ¶ 44; Doc. No. 33 at 8–11.) As an initial matter, this claim must be dismissed against Mace and Smith because they did not arrive on the scene until after the traffic stop. Thus, this claim is directed solely at Danner's actions.

A traffic stop violates an individual's Fourth Amendment right to be free from unreasonable searches and seizures unless the stop is supported (1) by probable cause to believe a civil traffic violation occurred, or (2) by reasonable suspicion of ongoing criminal activity. United States v. Collazo, 818 F.3d 247, 253–54 (6th Cir. 2016) (citing United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008)). Danner concedes that he "did not have probable cause to effect a stop" because he had not witnessed Muir violate any traffic laws. (Danner Dep. at 22:22–23:8.) Instead, Danner contends he is entitled to summary judgment because he had reasonable suspicion to suspect Muir of driving while intoxicated (Doc. No. 22 at 8–10), which is a crime in Tennessee, see Tenn. Code. Ann. § 55-10-401.

The reasonable suspicion necessary to justify a traffic stop requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, 572 U.S. 393, 396–97 (2014) (citing United States v. Cortez, 449 U.S. 411, 417–18 (1981)). "The standard takes into account 'the totality of the circumstances—the whole picture.'" Id. at 397 (quoting Cortez at 417). "Although a mere 'hunch' does not create a reasonable suspicion, . . . the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Id.

Danner testified that he had reasonable suspicion to stop Muir for intoxicated driving based on his personal observations of Muir's driving, along with the information Deputy Garrett relayed

to the dispatcher. (See Danner Dep. at 21:8–22:3.) As relevant to this case, an "officer's reasonable suspicion need not arise exclusively from his own direct observations." Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008). "Rather, it can be derived from . . . dispatch information[] and directions from other officers." Id. (citing Smoak v. Hall, 460 F.3d 768, 779 (6th Cir. 2006)). "A seizure conducted in reliance on . . . dispatch does not violate the Fourth Amendment if the law enforcement officer who issued the information possessed the necessary reasonable suspicion." Smoak, 460 F.3d at 779 (citation omitted). Thus, the issue before the Court is whether Danner *or* Garrett had the requisite reasonable suspicion to justify the traffic stop.

Viewing the evidence in the light most favorable to Muir, a jury could reasonably conclude that neither Garrett nor Danner possessed the necessary reasonable suspicion to stop Muir for intoxicated driving. Although both officers reported that Muir was weaving in her own lane of traffic, the Sixth Circuit "ha[s] never held that weaving *within a lane* is enough to show intoxication without some other indicia of erratic driving." Warfield, 727 F. App'x at 187 (citing Gaddis ex rel. Gaddis v. Redford Twp., 364 F.3d 763, 766–67 (6th Cir. 2004)). Moreover, there is certainly a dispute of fact about whether Muir was driving erratically, particularly because Garrett reported that she was "doing the speed limit" and was not "going *over* the lines, (Doc. No. 20-1 at 3–4) (emphasis added), and Danner testified that he observed Muir complete a Taco Bell drive-through transaction without incident before he stopped her, (Danner Dep. at 18:11–20:6). Muir also testified that she "was driving the speed limit the whole way" and that Garrett lied about her swerving back and forth. (Muir Dep. at 58:24–59:24.)

Accordingly, the Court must deny summary judgment on this claim because it cannot conclude that Danner had reasonable suspicion as a matter of law to stop Muir's vehicle. It will be up to the jury to decide, based on the totality of the circumstances, whether Danner or Garrett had

9

a particularized and objective basis for suspecting Muir was driving under the influence, or whether Danner violated Muir's Fourth Amendment rights by initiating a suspicionless traffic stop. And if the jury determines that Danner violated Muir's constitutional rights, Danner would not be entitled to qualified immunity because it was clearly established that he needed reasonable suspicion to effectuate a traffic stop. Collazo, 818 F.3d at 253–54.

2. Removal from the Vehicle and Administration of Field Sobriety Tests

Muir argues that the Individual Defendants further violated her Fourth Amendment rights during the traffic stop by "forcing [her] to get out of her vehicle . . . and administering a field sobriety test without reasonable suspicion or probable cause to believe she was intoxicated." (Doc. No. 31 at 1, 12–13; see also Doc. No. 1 ¶ 44.) Again, this claim must be dismissed against Mace and Smith because neither asked Muir to exit her vehicle nor administered the field sobriety tests.

As for Danner, this allegation again is entirely dependent on how the jury resolves the issue of whether Danner had reasonable suspicion to stop Muir for intoxicated driving. If the stop was legal, Danner had a right to order Muir out of her vehicle, Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977), and conduct field sobriety tests, United States v. Oliver, 126 F. Supp. 2d 495, 501 (S.D. Ohio 2000) (finding that "when a police officer makes a traffic stop of an erratic or reckless driver, . . . the fact that the officer on the scene performs a field sobriety test of the driver . . . does not offend the Constitution in any way"). If the stop was not supported by reasonable suspicion, then the entire stop was illegal, and this issue is moot. Either way, it would not be appropriate for the Court to resolve this issue by summary judgment.

3. Arrest for Driving Under the Influence

Muir also claims that the Individual Defendants violated her constitutional rights by arresting her for driving under the influence without probable cause. (Doc. No. 33 at 13–14.) "It is clearly established that arrest without probable cause violates the Fourth Amendment." Klein v.

Long, 275 F.3d 544, 550 (6th Cir. 2001) (citation omitted). "An officer has probable cause when 'the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." Miller v. Sanilac Cnty., 606 F.3d 240, 248 (6th Cir. 2010) (quoting Henry v. United States, 361 U.S. 98, 102 (1959)). "[T]he officer must consider the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest." Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000). Thus, when the Court is called upon to determine whether probable cause existed, it must examine the totality of the circumstances and "consider only the information possessed by the arresting officer at the time of the arrest." Parsons v. City of Pontiac, 533 F.3d 492, 501 (6th Cir. 2008) (quoting Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir. 2008)). Given the fact-intensive nature of this inquiry, "[i]n general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." Id. (quoting Fridley v. Horrighs, 291 F.3d 867, 872 (6th Cir. 2002)).

Defendants argue that summary judgment is appropriate because "Danner had probable cause as a matter of law to arrest [Muir] for driving under the influence based upon the fact that she failed four sobriety tests." (Doc. No. 20 at 2.) But "view[ing] the facts in the light depicted by the videotape," Scott, 550 U.S. at 381, the Court cannot conclude as a matter of law that probable cause existed. The Court agrees with the Individual Defendants that Muir had difficulty maintaining her balance during the walk-and-turn test, and that she was completely unable to perform the one-leg-stand test. It also appears that Muir did not follow Danner's instructions for the HGN test when she originally moved her head to follow Danner's finger. However, a jury could just as easily interpret the video as militating against a finding of probable cause. For example, Muir successfully completed the "finger-to-thumb" dexterity test (see Danner Dep. at

11

54:11–55:6), and it appears that Muir eventually was able to follow Danner's finger with her eyes during both the HGN test and the VGN test. Moreover, Muir exhibited seemingly rational behavior throughout the stop (although she appeared both frustrated and nervous), requested to take a urine test several times, and was adamant that she had not taken any prescription medications, which was later confirmed by her negative blood test. Also, officers did not find any drugs or alcohol during their thorough search of Muir and her vehicle.

Several instructive Sixth Circuit decisions support the Court's conclusion here. In Miller, an officer stopped a driver for allegedly driving through a stop sign on an icy road. 606 F.3d at 245. During the stop, the officer claimed he had probable cause to arrest the driver for driving under the influence because he smelled of alcohol, had "glazed or glassy" eyes, had a previous drunk-driving arrest on his record, and failed all but one of the field sobriety tests. Id. at 245–46. After his arrest, the driver's blood test came back negative for both alcohol and drugs, and all charges against him were dismissed. Id. at 246. In reversing the district court's grant of summary judgment on the driver's § 1983 false arrest claim, the Sixth Circuit held that although "subsequent evidence that plaintiff had not been drinking does not vitiate the probable cause established by what the officer observed and the results of the field sobriety tests," the fact that the driver had no alcohol in his blood "casts doubt" on the officer's claim that the driver "smelled of alcohol and failed the field sobriety tests." Id. at 248. Thus, the totality of the circumstances created a disputed issue of material fact regarding whether the officer had probable cause for the arrest. Id. at 248–249.

The Sixth Circuit followed its approach in Miller when it decided Green two years later. The officer in Green initially stopped a driver for failing to dim her high beam lights and because she "briefly crossed over a shoulder lane marker." 681 F.3d at 856–57. During the stop, the officer

12

noticed, among other things, that the driver's pupils "were constricted," which was "abnormal" and may have indicated that she had taken drugs. 681 F.3d at 857. The officer then administered five sobriety tests. Id. at 858. He claimed that the driver failed the HGN test, and the video evidence showed that the driver lost her balance and raised her arms during both the one-leg-stand test and the walk-and-turn test. Id. at 858–59. The officer eventually arrested the driver for driving under the influence. Id. at 859. However, "[w]hen [the driver's] urine test later came back negative for both alcohol and drugs, all charges against her were dismissed." Id. The Sixth Circuit again reversed the grant of summary judgment on the driver's § 1983 claim, holding as follows:

> [W]e are ultimately convinced that [the driver's] performance on the tests was sufficiently ambiguous to submit the probable-cause question to the jury. She completed several of the tests without any apparent difficulty and others with only minor mistakes. And the video does not show whether she could follow the pen with her eyes when [the officer] tried to administer the HGN test. Because reasonable jurors could interpret the video evidence differently, we conclude that the district court erred in deciding as a matter of law that [the officer] had probable cause to arrest [the driver].

Id. at 865–66.

Although the facts in Miller and Green are not identical to those here, there are many important similarities. In all three cases, the drivers were allegedly driving in an irregular manner, allegedly failed multiple field sobriety tests, and took subsequent lab tests that came back negative for alcohol and drugs. And like the driver in Green, Muir adamantly denied ingesting drugs or drinking alcohol during the stop. See Reeves v. City of West Liberty, 219 F. Supp. 3d 600, 604 (E.D. Ky. 2016) (comparing facts to Green). Despite these similarities, Defendants do not distinguish or even cite Miller or Green, and instead argue that this "case is legally identical and factually very similar to" Jolley v. Harvell, 254 F. App'x 483 (2007). (Doc. No. 22 at 11–13.) Sure, there are also some similarities between this case and Jolley, but that unpublished case was decided

13

*before* the published opinion in Miller and Green, and the Sixth Circuit has since addressed, discredited, and distinguished Jolley's holding as follows:

> . . . Jolley was pulled over at 2:23 a.m. because he paused at a stop sign for 30 seconds for no apparent reason. The officer claimed to have smelled marijuana during the stop and proceeded to administer several field sobriety tests, all of which were recorded on video. Jolley performed well on most of the tests, but he failed to complete the one-leg-stand test. He was then placed under arrest for driving while impaired and, after a subsequent test for drugs or alcohol revealed that he was sober during the stop, he brought suit against the arresting officer.
>
> In an opinion that was issued prior to Miller, a panel of this court held that the arrest was lawful. The lead opinion reasoned as follows:
>
>> Although there are certainly facts that militate against a finding of probable cause, there are sufficient facts to support the arrest. We would be hard-pressed to conclude that no reasonably prudent officer would have made the same decision, especially when balanced against the potential consequences of an incorrect call had Jolley ultimately proven to be impaired. A drunk driver is a severe threat to the safety of others. Jolley's ultimate innocence is irrelevant.
>
> Id. at 489 (citations omitted).
>
> We do not know whether Jolley would have been decided differently had Miller come before it, and we note that the concurring opinion in Jolley was unwilling to join in the reasoning of the lead opinion. But even putting these reservations to one side, Jolley is an unpublished, nonbinding case that can be distinguished on its facts. The arrest in that case took place in the middle of the night, after the driver exhibited unusual driving behavior and failed to complete the one-leg-stand test. Here, in contrast, [the driver] was pulled over for committing two fairly common traffic violations, [the officer] did not claim to have seen or smelled any drugs or alcohol during the stop, and [the driver] was able to substantially complete all the field sobriety tests given to her except for the HGN test—and her performance on that test cannot be ascertained from the video because her back was facing the camera. These differences, when combined with [the driver's] seemingly rational behavior during the stop, could lead a jury to conclude that there was no probable cause to arrest [the driver] for driving while impaired and that [the officer] was plainly incompetent in thinking that there was.

Green, 681 F.3d at 866. Given these potentially conflicting holdings, the Court must follow the reasoning in Miller and Green, not Jolley, because "[a] published prior panel decision remains controlling authority" in the Sixth Circuit. Rutherford v. Columbia Gas, 575 F.3d 616, 619 (6th Cir. 2009) (internal quotation marks omitted).

Following the reasoning in Miller and Green, the Court finds that Danner is not entitled to summary judgment because whether Danner had probable cause to arrest Muir turns on disputed issues of fact. In other words, there is not "only one reasonable determination" here, as another officer in Danner's position could have reasonably concluded there was no probable cause. See Parsons, 533 at 501; see also Reeves, 219 F. Supp. 3d at 604. Accordingly, it will be the jury's duty at trial to review the evidence, assess the credibility of the parties and witnesses to this action, and determine whether the facts known to Danner ultimately support a finding of probable cause.[7] And if the jury determines that Danner violated Muir's constitutional rights, Danner would not be entitled to qualified immunity because it was clearly established that he needed probable cause to arrest her. Klein, 275 F.3d at 550.

On the other hand, Mace and Smith cannot be held personally liable on this claim because they did not make the decision to arrest Muir. Although Mace testified that he and Smith were ranked higher than Danner, (see Mace Dep. at 4:22–6:17), "[s]upervisory liability under § 1983 does not attach when it is premised on a mere failure to act; it 'must be based on active unconstitutional behavior.'" Greene v. Barber, 310 F.3d 889, 899 (6th Cir. 2002) (quoting Leach

---

[7] Defendants' reply brief attaches two "expert opinions" that were not included in their original motion for summary judgment. These opinions by Dr. Sullivan Smith (Doc. No. 35-1) and Phillip McClain (Doc. No. 35-2) mainly focus on why Danner had probable cause to arrest Muir for driving under the influence. But because the Court can review the video evidence itself and these two individuals did not personally witness the events at issue in this case, the Court will not give any weight to these opinions on summary judgment.

15

v. Shelby Cnty. Sheriff, 891 F.2d 1241, 1246 (6th Cir. 1989). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" Everson v. Leis, 556 F.3d 484, 495 (6th Cir. 2009) (quoting Hays v. Jefferson Cnty., 668 F.2d 869, 874 (6th Cir. 1982)). Mace and Smith arrived on the scene after Muir had already been stopped, they did not assist Danner in physically arresting Muir, and they did not have any pre-arrest discussions with Danner regarding his basis for probable cause. (See Mace Dep. at 24:13–25:24; Smith Dep. at 25:11–26:17; see also Video at 23:53:36.) Because Muir has not presented evidence to establish that Mace or Smith actively engaged in her allegedly unconstitutional arrest, Defendants' motion for summary judgment will be granted to the extent she asserts a false arrest claim against Mace or Smith.[8] See Cole v. Barnes, 128 F. Supp. 3d 1002 (M.D. Tenn. 2015).

    4.    Vehicle Search

Muir also alleges that her Fourth Amendment rights were violated when the Individual Defendants searched her vehicle after she was arrested. As an initial matter, this claim must be dismissed against Smith because he was not involved in the search. (Mace Dep. at 26:15–20; Smith Dep. at 30:2–12.)

Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). As relevant here,[9] one of those exceptions provides that a warrantless search of

---

[8] Given the Court's holding, there is no need to decide whether Mace and Smith are also entitled to qualified immunity on this claim.

[9] A lawful arrest would not be necessary if the "automobile exception" applied. "Under the automobile exception to the warrant requirement, 'an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime.'" United States v. Johnson, 707 F.3d 655, 658 (6th Cir. 2013) (quoting United States v. Redmond, 475 F. App'x 603, 607 (6th Cir. 2012)). This exception does not apply here, however,

16

a vehicle *incident to a lawful arrest* is permissible when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Arizona v. Gant, 556 U.S. 332, 333 (2009) (citation omitted). However, for purposes of summary judgment, the Court does not need to decide whether it was "reasonable to believe" that Muir's car might contain evidence relevant to driving while intoxicated (her alleged crime of arrest) because, as explained above, there is a dispute of material fact regarding whether Muir's arrest was lawful in the first place. If Muir's arrest was not supported by probable cause, there would be no valid exception to the warrant requirement, and the search of her vehicle would be per se unconstitutional.[10]

For these reasons, the Court must also deny Danner and Mace's claim of qualified immunity at this stage because there is a dispute of fact regarding whether their vehicle search violated Muir's constitutional rights, Humphrey, 482 F.3d at 846, and a warrantless search of her vehicle would have violated clearly established law, Katz, 389 U.S. at 357.

### 5. Blood Draw

Last, Muir alleges that the Individual Defendants violated her Fourth Amendment Rights by forcibly extracting blood from her body without probable cause to believe she was intoxicated. (Doc. No. 1 ¶ 44.) At the outset, the Court must dismiss this claim against Mace and Smith because Muir has not offered any evidence that they were involved in her blood draw.

Danner did not personally extract Muir's blood, but he did submit an affidavit to secure the blood-draw warrant. (Doc. No. 32-2.) Although "[t]here is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant," Danner's affidavit could be invalidated if

---

because Defendants have not argued that they had probable cause to believe Muir's vehicle contained evidence related to her alleged crime.

[10] Neither party submitted any authority or argument about whether Mace could reasonably rely on Danner's probable cause assessment to search Muir's vehicle with impunity. The parties should be ready to discuss this issue at the pretrial conference.

17

Muir could show that it contained false statements made "knowingly and intentionally, or with reckless disregard for the truth." Franks v. Delaware, 438 U.S. 154, 155–56, 171 (1978). This issue certainly presents a close call, but because there is a dispute of fact regarding whether Danner had probable cause to arrest Muir in the first place, the Court will not conclude, for purposes of summary judgment, that Danner's affidavit was valid as a matter of law. Accordingly, the Court will deny summary judgment as to Muir's claim that Danner violated her constitutional rights by securing the blood-draw warrant. Moreover, Danner is not entitled to qualified immunity at this stage because Muir's right to be free from a warrantless blood draw was clearly established. See Missouri v. McNeely, 569 U.S. 141, 152 (2013) ("In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.").

> B.   Muir's § 1983 Municipal Liability Claim Against the City of Livingston

Muir also asserts a § 1983 claim of municipal liability against the City of Livingston because it allegedly "acted with deliberate indifference to, and or a conscience disregard for [Muir's] constitutional rights by failing to train and/or supervise the Livingston Police Department officers on the methods to properly effectuate routine traffic stops, detentions, arrests and searches without violating the Fourth Amendment rights of citizens." (Doc. No. 1 ¶ 45.)

"To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated *and* that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights." Miller, 606 F.3d at 254–55 (citations omitted) (emphasis added). "A systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability," but only if "the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." Id. at 255 (citations

18

and internal quotation marks omitted). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" Id. (quoting Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005)).

Here, Muir argues that the City of Livingston did not adequately train Smith, Danner, and Mace in the Fourth Amendment requirements for lawful searches and seizures. (See Doc. No. 33 at 18–20.) Regardless of whether that is true, her municipal liability claim still fails because she has not offered *any* evidence that the City of Livingston had a systematic failure to train police officers adequately, that a policy or custom was the moving force behind the alleged constitutional violations, or that there was a deliberate indifference based on prior instances of unconstitutional conduct. Miller, 606 F.3d at 255. Thus, even if the Individual Defendants violated Muir's constitutional rights, the Court must still grant the City of Livingston's motion for summary judgment.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 20) will be granted in part and denied in part. All of Muir's claims against the City of Livingston and Lieutenant Smith will be dismissed. Muir's claims against Corporal Mace will also be dismissed, except for her claim against Mace for conducting an unconstitutional search of her vehicle. This case will proceed to trial on Muir's remaining claims.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE